# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

No. 08-63C
(Filed Under Seal April 27, 2010)
(Reissued: May 10, 2010)[1]
TO BE PUBLISHED

|  |  |  |
|---|---|---|
| | ) | Navy disability evaluation system; |
| | ) | Informal and Formal Physical |
| THOMAS R. STINE, | ) | Evaluation Boards ("PEBs"); |
| | ) | waiver of formal PEB |
| | ) | determination; legal competence; |
| Plaintiff, | ) | scope of waiver of hearing before |
| | ) | formal PEB; Veterans |
| | ) | Administration Schedule for |
| v. | ) | Rating Disabilities ("VASRD"); |
| | ) | Navy's use of VASRD to assess |
| | ) | fitness for military duty; deference |
| THE UNITED STATES, | ) | to determinations of the Board for |
| | ) | Correction of Naval Records |
| | ) | ("BCNR"); 10 U.S.C. |
| Defendant. | ) | § 1552(a)(1); 32 C.F.R. |
| | ) | § 723.3(e)(2); BCNR's credibility |
| | ) | determinations |
| | ) | |

Michael D.J. Eisenberg, Law Office of Michael D.J. Eisenberg, Washington, D.C., for plaintiff.

John S. Groat, Trial Attorney, Kirk T. Manhardt, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, Tony West, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Marc S. Brewen, Office of the Judge Advocate General, United States Navy, Washington, D.C., of counsel.

---

[1] This Opinion and Order was originally filed under seal on April 27, 2010, pursuant to this Court's September 17, 2008 protective order, and the parties were given ten days to advise the court what, if any, redactions they believed were necessary before public issuance. Neither party proposed redactions. Accordingly, the Opinion and Order is released in its entirety.

**OPINION AND ORDER**

<u>GEORGE W. MILLER</u>, Judge

Plaintiff Thomas Stine alleges that the United States Navy ("Navy") wrongfully discharged him and underestimated the extent of his service-related disabilities, and further that the Board for Correction of Naval Records ("BCNR" or "the Board") acted arbitrarily in denying his application for correction of his naval records. *See* Compl. ¶ 1 (docket entry 1, Jan. 29, 2009). For the reasons stated below, defendant's motion for judgment on the administrative record is **GRANTED**.

**I.    Background**[2]

    *A.    First Naval Service: 1977-1979*

Mr. Stine began his naval service in late 1975. AR 351. During this first service, he received repeated treatment for sinus infections, AR 384, 385, 402; nervousness and hyperventilation, AR 384, 392; back, hip, and groin pain, AR 388, 432; chest pains and shortness of breath, AR 390, 398; headaches and blurry vision, AR 408; and gonorrhea, AR 400. On December 8, 1977, Mr. Stine began to experience foot pain, which was treated with physical therapy. AR 141. Mr. Stine was then deployed to Okinawa, Japan, and while stationed there again began experiencing plantar arch pain. *Id.* After some treatment, including surgery to remove plantar nodules, AR 410, a commanding officer convened a Medical Evaluation Board ("MEB")[3] to evaluate Mr. Stine's condition, and on February 20, 1979, the MEB issued a report

---

[2]  The facts relating to Mr. Stine's naval service are drawn from the Administrative Record ("AR"), filed with the Court on November 5, 2009 (docket entry 46).

[3]  Pursuant to Secretary of the Navy Instruction ("SECNAVINST") 1850.4D, if a commanding officer believes a service member is suffering from a physical or mental disability, the commanding officer may convene a Medical Evaluation Board ("MEB"), which "serves to report upon the present state of health of any member of the Armed Forces and as an administrative board by which the convening authority or higher authority obtains a considered clinical opinion regarding the physical status of service personnel." SECNAVINST 1850.4D § 3104(a), (b); *see also* Manual of the Medical Department for the United States Navy ("MANMED") § 18-1(2). The MEB is charged with making "a clear statement of its opinion that the member's condition does or does not render the member unable to continue naval service by reason of physical impairment." SECNAVINST 1850.4D § 3901(a) (internal quotation omitted). Although SECNAVINST 1850.4D was later replaced by another regulation, the parties concede that 1850.4D applies to Mr. Stine's case. *See* Defendant's Motion to Dismiss at 4 n.1 (docket entry 43, Oct. 20, 2009) ("Def.'s Mot."); Plaintiff's Response to Defendant's Motion to Dismiss at 3 (docket entry 49, Dec. 21, 2009) ("Pl.'s Resp.").

diagnosing Mr. Stine with plantar fibromatosis.[4]  AR 141-42.

The MEB forwarded its findings to an Informal Physical Evaluation Board ("IPEB"),[5] which found that the plantar fibromatosis rendered Mr. Stine unfit for naval service and recommended separation from the Navy with a 10% disability rating and severance pay.  AR 133-40.  Mr. Stine was discharged from the Navy on January 26, 1976 with severance pay of $3,385.80.  AR at 350-51.

B.      Period After First Naval Service: 1979-1988

After his discharge in 1976, Mr. Stine lived in Hawaii with his wife.  Mr. Stine attended college, while his wife was on active duty with the Navy.  During this period, Mr. Stine was treated by an orthopedist for his foot condition, and also complained of swelling in his hip and knees, along with back and neck pain.  AR 1950-64, 2025-39.  He was hospitalized for surgery to remove a ganglion cyst on his right wrist on June 19, 1986, AR 1968-2027, resulting in doctors completing a form detailing Mr. Stine's prior medical history.  AR 1971-77.  The report indicates that in addition to problems with his feet, Mr. Stine: (1) had some visual changes, but that he "wears corrective lenses," (2) had a history of heart disease, specifically mitral valve prolapse, and (3) awoke two to three times a night needing to urinate (a condition known as nocturia).  AR 1974-76.  Although a pre-operation report indicates that a chest x-ray indicated "no significant interval change since previous examination of 5/8/86," AR 2008, there is no documentation in the record of the May 1986 examination.

C.      Second Naval Service: 1988-2001

1.      Re-enlistment

On December 20, 1988, Mr. Stine re-enlisted in the Naval Reserves and subsequently sought to re-enlist in the regular-duty Navy.  AR 279.  As part of the re-enlistment process, Mr. Stine completed a Report of Medical History on Standard Form ("SF") 93, which required him to mark whether he had ever experienced or been diagnosed with a series of medical conditions. AR 757.  Mr. Stine checked "yes" next to two conditions: "[t]umor, growth, cyst, cancer" and

---

[4]  Plantar fibromatosis involves the formation of benign abnormal growths (fibromas) affecting the connective tissue in the foot (fascia).  STEDMAN'S MEDICAL DICTIONARY 724-25, 1288, 1505 (28th ed. 2006) ("STEDMAN'S").

[5]  After making its determination, the MEB forwards its report to an Informal Physical Evaluation Board ("IPEB"), a panel composed of three senior officers.  SECNAVINST 1850.4D §§ 4201, 4202(a).  The IPEB "screen[s] incoming cases for acceptance and, if accepted, perform[s] the initial disability evaluation on the basis of documentary review of case records." Id. § 4201.  The IPEB also makes the initial determination of whether a service member is fit or unfit to continue naval service and assigns a disability percentage rating.  Id. §§ 4210-4211.

"[f]oot trouble"; he checked "no" next to all other conditions, and reported "[n]o significant medical history or surgical history since 1981." AR 757-58.  Mr. Stine was also examined by a Navy flight surgeon,[6] who examined Mr. Stine's feet, concluding that there were "scars on both feet, but no masses noted.  No tenderness on day" of examination.  AR 755.

Because of his history of foot troubles, the Navy required Mr. Stine to obtain medical clearance before allowing him to re-enlist.  AR 746, 749.  Mr. Stine obtained a letter from Dr. Russell W. Fiel stating that "Thomas Stine has [had] no problem with his feet since his last surgery in 1981," AR 751, and Dr. John S. Urse, who, after evaluating Mr. Stine's condition, wrote: "I see no reason for restricting the enlistment." AR 750.  With the clearance of the two doctors and the flight surgeon, Mr. Stine was re-enlisted in the regular-duty Navy on June 19, 1989.  AR 287.

Mr. Stine's initial performance upon re-enlistment was stellar.  In addition to several commendations, AR 167, 173, 180, he received excellent performance reviews from his superiors.  *See, e.g.,* AR 190 ("Petty Officer Stine is hard working and dedicated.  He is ready to assume positions of greater responsibility."); AR 188 ("Petty Officer Stine is a tremendous asset to the command and the local community.  He has unlimited potential, and is *most strongly recommended* for advancement and retention in the U.S. Naval Service."); AR 186 ("*Superior Performer*.  Displays character, initiative and resourcefulness to accept and accomplish the most demanding tasks."); AR 183 ("Petty Officer Stine constantly demonstrates superlative professionalism with an abundance of personal dedication and self sacrifice."); AR 179 ("One of my best, Petty Officer Stine will make an excellent Chief or Officer.  Promote him now!").

2.    Medical Problems Upon Re-Enlistment

In 1998, Mr. Stine was deployed to Honduras as part of the relief effort after Hurricane Mitch.[7]  AR 156.  While in Honduras, he performed admirably; an evaluator describing Mr. Stine's work observed that he "[t]horoughly surveyed 8 major roads and 3 bridges destroyed by Hurricane Mitch in remote areas of Honduras . . . . [and] [c]apably assisted in preparing . . . assets for retrograde from Honduras to Puerto Rico."  AR 157.

But Mr. Stine began suffering symptoms of Post Traumatic Stress Disorder ("PTSD"),

---

[6] A "flight surgeon" is a military doctor specializing in assessing, diagnosing, and treating aviation personnel.  *See generally* THE NAVAL FLIGHT SURGEON'S GUIDE TO DUTIES AND RESPONSIBILITIES (John Lee MC, USN et al. eds., 4th ed. 2005), *available at* http://safetycenter.navy.mil/aviation/aeromedical/downloads/FlightSurgeonDuties.pdf.

[7] Mr. Stine also had some medical issues during his re-enlistment before his trip to Honduras.  In 1991, after an unspecified "negative interaction with his Chief," Mr. Stine began experiencing anxiety problems.  AR 59.  In 1997, Mr. Stine became depressed and felt guilty due to his father's death and Mr. Stine's absence at the end of his father's life.  AR 61, 67.

feeling guilty over the "poverty and state of life of other people in Honduras." AR 61.  He also reported having flashbacks to his time in Honduras and developed insomnia while attempting to avoid nightmares.  AR 60.  When he did sleep, Mr. Stine reported a recurring nightmare "in which he is in a white tiled room with surgical stainless steel looking down on his body, and there is a door at the end of the room.  He is scared to go out the door, as he may not return to his body."  AR 60-61.

As of September 1999, Mr. Stine's division officer had noticed "an alarming downward trend in [his] job performance and capabilities."  AR 106.  The officer reported that beginning in March 2000, Mr. Stine was spending significant amounts of time at "various medical commitments."  *Id.*  He further noted that Mr. Stine "has displayed a lack of focus and poor judgment," and that he had been removed from his assigned duties because of his inability to perform.  *Id.*  The district officer then recommended that an MEB determine whether Mr. Stine was medically disabled.  *Id.*  On April 11, 2001, the commander of Mr. Stine's boat squadron completed a "Non-Medical Assessment Questionnaire" stating that Mr. Stine's "condition has deteriorated to a point where he does not meet minimum standards" and concluding that "it is inconceivable that he could ever serve effectively in a sea duty billet."  AR 103-05.

### 3.    Disability Evaluation Process

An MEB was convened to review Mr. Stine's medical record.  On March 12, 2001, and June 19, 2001, the MEB issued two reports stating its findings.  The MEB diagnosed four major conditions: "severe" PTSD; moderate chronic major depressive disorder; anxiety disorder; and complicated bereavement.  AR 59.  Mr. Stine was diagnosed with 18 additional medical conditions of varying degrees of severity, including acid reflux (gastroesophageal reflux disease), AR 76; irritable bowel syndrome, *id.*; upset stomach (dyspepsia), *id.*; steatohepatitis[8] (resolved), *id.*; Gilbert disease,[9] *id.*; hypothyroidism (also listed as "probable subclinical hypothyroidism"), *id.,* AR 85; right lateral femoral cutaneous neuropathy, *i.e.*, meralgia paresthetica,[10] AR 81; intractable tinnitus and hearing loss, AR 85; bilateral plantar fasciitis, AR 92; bilateral tarsal

---

[8]  Steatohepatitis involves inflammation of and fat accumulation in the liver.  STEDMAN'S 877, 1831.

[9]  Gilbert disease, also referred to as "familial nonhemolytic jaundice," is a genetically caused excess of bilirubin in the bloodstream that sometimes results in mild jaundice.  STEDMAN'S 218, 1010.

[10]  Meralgia paresthetica, or Bernhard Roth syndrome, is pain or discomfort caused by injury or "pinching" (*i.e.*, entrapment) of a nerve in the leg called the lateral femoral cutaneous nerve.  STEDMAN'S 762, 1186.

tunnel syndrome,[11] *id.*; and talar avulsion injury on the left side, *id.*[12]  Mr. Stine also had a number of problems in his cervical and lumbar spine, including degenerative disc disease, a herniated disc in the lumbar spine (herniated nucleus pulposus), a bulging disc in the cervical spine (paracentral disc), and bony growths (osteophyte complex), resulting in pain in the back, neck and right extremities (right-sided radicular symptoms).  AR 81, 92, 95.

Because Mr. Stine's diagnosis included a psychiatric disorder, the MEB, in accord with MANMED § 18-12(p),[13] opined as to whether Mr. Stine's psychiatric conditions rendered him incompetent to manage his own affairs.  The MEB stated:

> The patient's record does not indicate a past finding of incompetency or incapacity.  The service member is not in need of hospitalization.  At the present time the service member is considered fully competent to be discharged to his own custody. . . . [I]t is the opinion of the undersigned that the service member is mentally capable of handling his own financial affairs.

AR 70.  The "undersigned" doctors were Matthew F. Carroll and Barbara A. Smith, both Navy psychiatrists.  AR 71.

The MEB forwarded its report to an IPEB which, on August 1, 2001, found that two of Mr. Stine's conditions, major depressive disorder and anxiety disorder, were "Category I" conditions that rendered him unfit for continued service.[14]  AR 43.  The IPEB found that the

---

[11]  Tarsal tunnel syndrome is a condition in which the tibial nerve is compressed as it travels through the tarsal tunnel of the foot, resulting in pain.  STEDMAN'S 1916.

[12]  Talar avulsion is a fracture of the talus, a bone that helps connect the foot to the ankle. STEDMAN'S 189, 1934.

[13]   If the service member has received a psychiatric diagnosis, the MEB report must include a statement by a psychiatrist opining as to whether the service member is competent to manage his or her own affairs.  MANMED §§ 18-1(4); 18-12(p).

[14]  In determining fitness for continued service, "[t]he sole standard to be used in making determinations of physical disability as a basis for retirement or separation is Unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay."  SECNAVINST 1850.4D § 3301.  The IPEB classifies each condition in one of four categories:

> a. Category I:  All Unfitting Conditions.

> b. Category II: Those Conditions That Are Contributing To The Unfitting Condition.

remaining medical conditions were Category III conditions, that is, they were "not separately unfitting and [did] not contribute to the unfitting condition." *Id.*  Finally, the IPEB assigned a disability percentage rating of 10% and recommended severance pay.[15]  *Id.*  The record nonetheless contains some evidence contrary to the IPEB report.  Specifically, an unsigned memorandum sent to Mr. Stine dated October 1, 2001 written by Navy psychiatrist Barbara A. Smith states that Mr. Stine's "disability is much more significant than this finding [10% disability rating] reflects."[16]  AR 2405 ¶ 2.  Dr. Smith also opined that "Chief Stine is unable to function in many aspects of his life," and that "he remains capable of handling his own affairs partly due to him allowing his wife to manage him and his affairs daily.  His capacity to make decisions at work is very questionable."  *Id.* ¶ 3 (emphasis omitted).   Oddly, the letter was written by the same Dr. Smith who signed the MEB report stating that Mr. Stine was "fully competent to be discharged to his own custody . . . [and] mentally capable of handling his own financial affairs."  AR 70.

Mr. Stine decided to challenge the IPEB findings by requesting a hearing before a Formal Physical Evaluation Board ("FPEB").[17]  AR 52.  But after consulting with a military attorney,

---

      c. <u>Category III</u>: Those Conditions That Are Not Separately Unfitting, And Do Not Contribute To The Unfitting Condition.

      d. <u>Category IV</u>: Conditions Which Do Not Constitute A Physical Disability.

*Id.* § 4111.  Only those conditions in Category I are given a disability percentage rating.  *Id.*

[15]  In assigning the percentage of disability, the IPEB looks primarily to the Veterans Administration Schedule for Rating Disabilities ("VASRD"), a system developed and maintained by the Department of Veterans Affairs ("DVA"), but with some amendments attributable to policy differences between the two entities.  *Id.* § 3801(a); *see Hinkle v. United States*, 229 Ct. Cl. 801, 804-05 (1982).

[16] Dr. Smith's letter was not initially part of the record considered by the BCNR. Defendant's Motion for Remand at 6 (docket entry 19, Oct. 6, 2008).  Plaintiff argued before this Court that the letter was evidence that Mr. Stine should have received a higher VASRD rating and that he was legally incompetent at the time he purportedly waived review of the IPEB's determination.  Plaintiff's Opposition to Defendant's Motion to Remand at 1-2 (docket entry 22, Oct. 31, 2008).  At the parties' joint request, the Court's remand order directed the BCNR to consider the letter as a part of its record.  Remand Order ¶ 3 (docket entry 32, March 26, 2009).  Thus, the Court properly considers Dr. Smith's letter as part of its review of the BCNR's decision.  *Metz v. United States*, 466 F.3d 991, 999 (Fed. Cir. 2006).

[17]  After making the fitness determination and assigning a percentage rating, the IPEB notifies the service member of its "preliminary" findings.  If the service member disagrees with the findings of the IPEB, he or she can either ask to submit additional evidence and seek a

Lieutenant Stacy Pintar, Judge Advocate General Corps, Mr. Stine changed his mind and decided to accept the IPEB findings.  AR 46.  Mr. Stine was given a document from the President of the Physical Evaluation Board ("PEB") titled "Acceptance/Waiver,"[18] which read:

> I accept the finding of the Informal Physical Evaluation Board dated 31 July 2001.
> I understand that by accepting the preliminary findings, I waive my right to the
> formal hearing I demanded.  I also have no right to submit a Petition for Relief
> from Final Action to the Director, Navy Council of Personnel Boards.  I
> understand my acceptance of the Informal Board's preliminary findings means the
> President, Physical Evaluation Board may finalize my case within the next two
> weeks.  The Informal Board has found me
>
> UNFIT FOR DUTY with [a] 10% disability rating.  I will be separated from the naval
> service with severance pay and no further benefits from the naval service.
>
> I have consulted my counsel prior to submitting this acceptance/waiver.

*Id.*  Both Mr. Stine and his attorney, Ms. Pintar, signed the waiver.  *Id.*  Consequently, on October 18, 2001, the President of the PEB discharged Mr. Stine with a disability rating of 10% and $69,422.40 in severance pay.  AR 42, 353.

     D.     *Period After Second Naval Service: 2001-Present*

     1.     <u>Department of Veterans Affairs Disability Rating</u>

In 2002, Mr. Stine applied to the DVA for benefits, which were granted on July 30, 2002.  AR 8.  DVA assigned Mr. Stine an overall combined disability rating of 100% due to individual

---

reconsideration by the IPEB, SECNAVINST 1850.4D § 4213(2)(c), or demand a hearing before a Formal Physical Evaluation Board ("FPEB").  *Id.*

If the service member elects to demand a FPEB hearing, the IPEB findings are considered null and void and the FPEB makes its determination *de novo* after a formal hearing.  *Id.* § 4301(c).  The service member is entitled to be represented by counsel, and two judge advocates are permanently assigned to each FPEB panel to act as counsel for service members appearing before the panel.  *Id.* § 4310; 3 FEDERAL PROCEDURE, LAWYERS EDITION § 5:386 (1999).

[18]  If the service member elects to accept the findings of the IPEB, the service member waives his or her right to present further evidence before an IPEB or FPEB.  SECNAVINST 1850.4D § 4301(a).  The service member is not entitled to appointed legal counsel during the IPEB process.  *Id.* § 4217.  If the service member requests FPEB review but elects to waive his or her FPEB hearing, the IPEB findings are immediately forwarded to the PEB who will, after legal review, and if no errors are found, issue appropriate formal findings.  *Id.* § 4212.

disabilities totaling well over 100%.  AR 4.  DVA issued the following findings:

| Condition(s) | VASRD Rating and Rationale |
|---|---|
| Anxiety disorder/major depressive disorder/PTSD | DVA assigned a 70% disability rating effective the day after separation from service, noting that its examination "show[ed] occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike [sic] setting); inability to establish and maintain effective relationships."  AR 10.  DVA noted that a 100% rating was not warranted because there was not a "total occupational and social impairment."  *Id.* |
| Bulging disc, degenerative changes, lumbosacral strain | DVA assigned a 40% disability rating from February 1, 2002 due to "severe limitation of motion of the lumbar spine."  AR 11. |
| Asthma | DVA assigned a 30% disability rating from February 1, 2002 due to Mr. Stine's performance in various lung capacity tests.  DVA noted that Mr. Stine was on continuous medications for this condition.  AR 11. |
| Irritable bowel syndrome and hiatal hernia with gastroesophageal reflux disease | DVA assigned a 30% disability rating from February 1, 2002 due to "symptoms of diarrhea, or alternating diarrhea and constipation, with more or less constant abdominal distress."  AR 11.  DVA noted that Mr. Stine received "the highest schedular evaluation for this condition."  *Id.* |
| Tempromandibular joint dysfunction (TMJ)[19] | DVA assigned a 10% disability rating from February 1, 2002 due to "limited inter-incisal movement between 31 and 40 mm with pain."  AR 12. |

---

[19] TMJ is a condition consisting of chronic problems with movement of the jaw.  STEDMAN'S 163, 596.

| Condition(s) | VASRD Rating and Rationale |
|---|---|
| Hypertension | DVA assigned a 10% disability rating from February 1, 2002 based on abnormally elevated blood pressure and use of medications.  AR 12. |
| Tinnitus | DVA assigned a 10% disability rating from February 1, 2002, "the highest schedular evaluation for this disability," due to Mr. Stine's reports of this condition from 2001.  AR 12. |
| Eczema, arms and legs | DVA assigned a 10% disability rating from February 1, 2002 because an examination showed "exfoliation, exudation, or itching involving an exposed surface or extensive area."  AR 12. |
| Sinusitis, chronic, with rhinitis (claimed as allergies) | DVA assigned a 10% disability rating from February 1, 2002 because of "evidence of one or two incapacitating episodes per year of sinusitis requiring prolonged (lasting four to six weeks) antibiotic treatment, or three to six non-incapacitating episodes per year of sinusitis characterized by headaches, pain, and purulent discharge or crusting."  AR 13. |
| Residuals, status post left talus avulsion fracture | DVA assigned a 10% disability rating from February 1, 2002 for residual "soreness, stiffness, discomfort, and limitation of motion" from a fractured left ankle on February 25, 2001.  AR 13. |
| Tarsal tunnel syndrome, bilateral | DVA assigned a 10% disability rating "for incomplete paralysis of foot movements which is moderate or mild."  AR 13.  DVA noted that Mr. Stine "reported tenderness, pain and numbness in both ankles" and "[x]-rays showed soft tissue swelling over both ankles." *Id.* |
| Plantar fibromatosis, bilateral | DVA assigned a 10% disability rating due to "scarring which is tender and painful on objective demonstration."  AR 14.  This was the highest possible disability rating for that disorder.  *Id.* |
| Thyroid condition | DVA found this condition to be non-compensable because it was in remission.  AR 14. |
| Hearing loss | DVA found this condition to be non-compensable based on the level of Mr. Stine's hearing loss.  AR 14. |
| Hyperlipidemia | DVA found this condition to be "non-compensable because the condition [was] not considered an actually disabling condition."  AR 15. |

| Condition(s) | VASRD Rating and Rationale |
|---|---|
| Gilbert's disease | DVA found this condition to be non-compensable because it was "a congenital or developmental defect" unrelated to Mr. Stine's military service.  AR 15. |
| Bilateral knee condition | DVA denied service connection for this condition because there was "no permanent residual or chronic disability [shown] by the service medical records or demonstrated by evidence following service."  AR 15. |
| Asbestos exposure | DVA denied service connection for this condition because there was "no permanent residual or chronic disability [shown] by the service medical records or demonstrated by evidence following service."  AR 15. |

Because of the DVA's ratings, Mr. Stine was found to be entitled to a monthly payment of $2,163.00, with $995.00 withheld for recoupment of his disability severance pay.  AR 16. Additionally, despite its finding regarding the severity of Mr. Stine's psychiatric conditions, DVA specifically found that Mr. Stine was competent and sent his benefits directly to him.  AR 10.

  2. <u>Petition to BCNR and First BCNR Decision</u>

  With his DVA rating of 100% disability in hand, on February 4, 2004, Mr. Stine petitioned the BCNR for correction of his naval records to reflect a 100% disability rating.[20]  AR 20.  In his application form, Mr. Stine attached his DVA records and wrote:

> Due to medical problems I was told by my command and medical [sic] that I was not going to remain on active duty.  I was offered a 10% lump sum honorable discharge . . . .  Before having my medical board I was told by the JAG officer that was handling me that the board at San Diego did not view the package as overall, but broke down each disability and that I would be lucky to walk out of the board with anything[,] much less the 10%.  This was based on her viewing other cases in

---

[20] After a service member has been separated from the naval service or permanently retired, the service member may petition the BCNR to correct his or her naval records. SECNAVINST 1850.4D § 5001.  The BCNR is limited to providing relief based upon three narrow grounds: (1) new or newly discovered evidence; (2) fraud, misrepresentation, or other misconduct; or (3) mistake of law.  *Id.; see* 10 U.S.C. § 1552(a)(1); 3 Federal Procedure, Lawyer's Edition § 5:387.  The Board will dismiss an application if the petitioner has failed to demonstrate "probable material error or injustice."  32 C.F.R. § 723.3(e)(2); 3 Federal Procedure, Lawyer's Edition § 5:428.

front of this board.  She told my wife and me that the officer that did the
psychological evaluations did not view PTSD as a legitimate disability.  I was
even told that if the 10% was dropped I could face an administrative discharge
. . . .  When I went to the VA to be evaluated I was given a score of 240% with all
disabilities added up.  This gave me a rating of 100% disability.  It was a surprise
to many that the Navy had put me out with just 10% based on their findings.

AR 20-21.

After reviewing Mr. Stine's petition and both his military and DVA records, a three-
member panel of the BCNR sitting in "executive session" denied Mr. Stine's application in a
two-page letter dated October 4, 2004.  AR 1-2; *see* 32 C.F.R. § 723.3(e)(1).  The Board found
that Mr. Stine had waived FPEB review of the IPEB's findings on October 4, 2001.  AR 1.  The
Board also found Mr. Stine's allegations regarding improper legal advice to be unconvincing and
"not supported by evidence contained in the available record."  AR 2.  The Board noted that the
disparity between the Navy's finding that PTSD was not separately unfitting and DVA's 70%
rating for Mr. Stine's mental health conditions could be explained "because the [DVA] assigns
disability ratings without regard to the issue of fitness for military duty.  In addition, it appeared
to the Board that the [DVA] based its rating determination in [Mr. Stine's] case, in large part, on
[his] subjective symptoms, rather than objective evidence of impairment."  *Id.*  Finally, BCNR
stated that Mr. Stine had "not demonstrated that [his] depressive and anxiety disorders were
objectively ratable at 30% or higher prior to [his] discharge from the Navy."  *Id.*  Therefore, the
Board concluded that Mr. Stine had not demonstrated the "existence of probable material error or
injustice."[21]  *Id.*

---

[21] Because Mr. Stine was discharged from the Navy between September 11, 2001 and
December 31, 2009, and was found unfit for duty with a percentage rating of 20% or less, he may
have had the option of seeking review of the ratings of his two unfitting conditions before the
Physical Disability Board of Review ("PBDR").  10 U.S.C. § 1554a(b), (d).  The PDBR was
created in response to a report by a Department of Defense independent review group, which
examined conditions at Walter Reed Army Medical Center and National Naval Medical Center.
*See* Independent Review Group on Rehabilitative Care and Administrative Processes at Walter
Reed Army Medical Center and National Naval Medical Center, Rebuilding the Trust 32 (Apr.
2007) ("The Under Secretary of Defense should conduct a quality assurance review [of] all . . .
Disability Evaluation System decisions of 0, 10, or 20 percent disability . . . cases since 2001 to
ensure consistency, fairness, and compliance with applicable regulations."); 153 Cong. Rec.
S9857-06, S9858 (daily ed. July 25, 2007) (statement of Sen. Levin) ("The bill also establishes
an independent board to review and, where appropriate, correct unjustifiably low Department of
Defense disability ratings awarded since 2001.").

In this case, the BCNR has reviewed and upheld the 10% rating assigned by the Navy to
Mr. Stine's two unfitting conditions.  We have not been asked to, and need not, decide whether
the BCNR adjudication now precludes Mr. Stine from seeking review at the PDBR.  In that
regard, his petition to the BCNR (Feb. 4, 2004) and complaint in this court (Jan. 29, 2008) were

3.    Complaint in this Court and Remand

On January 29, 2008, Mr. Stine filed his complaint in this court, alleging that the Navy's decision "to discharge Plaintiff contained manifest error and were [sic] clearly erroneous because these decisions made conclusions that were either contradicted or not supported by Plaintiff's military personnel file, and contrary to the [DVA's] July 30, 2002 award for service connected disability benefits starting February 1, 2002."  Compl. ¶ 25.

After fully briefing the Government's motion to dismiss on jurisdictional grounds, the Government withdrew its motion and the parties filed a joint motion to remand the case to the BCNR.  Defendant's Motion upon Behalf of the Parties to Remand (docket entry 31, March 23, 2009).  The Court granted the parties' joint motion and, on March 26, 2009, ordered that the case be remanded to the BCNR (docket entry 32).  The Court directed that the BCNR (i) afford Mr. Stine the opportunity to furnish the board with documentary evidence and argument regarding his claims and to compile an administrative record; (ii) request an advisory opinion from the Office of the Navy Judge Advocate General ("OJAG") regarding whether Mr. Stine received proper legal counsel prior to his waiver of an FPEB hearing and an advisory opinion from the Navy Counsel of Review Boards ("CORB") on the question whether the IPEB's findings were proper; (iii) include these advisory opinions in the administrative record; and (iv) issue a written decision explaining, in detail, the rationale behind its decision.

4.    Advisory Opinions and Second BCNR Decision

i.    OJAG Advisory Opinion

In accordance with the Court's remand order, BCNR asked the OJAG Rules Counsel, the body authorized to review complaints of professional misconduct, to conduct a review of Mr. Stine's allegations of improper representation by Ms. Pintar.  AR 2375-79.  The Rules Counsel appointed Lieutenant Dan Werner to conduct an initial review of Mr. Stine's allegations.  Lt. Werner interviewed Ms. Pintar, and a summary of that conversation is included in the record.  AR 2377-78.

Ms. Pintar stated that she recalled Mr. Stine's case, and that it was her opinion that "if the IPEB did not find a condition as unfitting, then the [FPEB] was not going to find it as unfitting" and that by going to an FPEB Mr. Stine "risked being found fit and offered no disability at all."  AR 2377-78.  In pertinent part, Lt. Werner summarized Ms. Pintar's opinion as follows:

Ms. Pintar stated that Chief Stine's primary objective was to be able to get a

_____

both filed before the Department of Defense had implemented the statute creating the PDBR. *See* Dep't of Defense, Instructions for Completing DD Form 294, Item 10, OMB. No. 0704-0453 (Jan. 2009) ("If you have filed with your Service BCMR/BCNR prior to the implementation of DoDI 6040.44 (June 27, 2008), you may still request PDBR review of your disability rating.").

disability percentage that would allow him to affiliate with the reserves so that he could finish out his time and earn a military retirement.  Chief Stine . . . was very interested in being able to apply all of those points [from his prior years of service] toward a reserve pension.  Ms. Pintar advised him that the best way to accomplish this was to have a disability percentage of around 10%.  Her experience was that members with a 10% rating had been able to affiliate with a reserve unit, but that members with a 20% or 30% rating had encountered either great difficulty in affiliating, or had simply been unable to do so. . . . Ms. Pintar feels that Mr. Stine made a calculated decision based upon his desire to maximize his chance at affiliating with a reserve unit and being able to earn enough drill points to qualify for a retirement pension.  She feels that she properly informed him of the risks and benefits of accepting the IPEB findings, and of the risks and benefits of proceeding to [an FPEB].

AR 2378-79.  After considering Ms. Pintar's statement, the Rules Counsel opined that "the evidence fails to establish probable cause to believe that Ms. Pintar provided improper legal counseling to Mr. Stine."  AR 2375.

ii.        CORB Advisory Opinion

The Board also referred the case to CORB, which focused on the IPEB process, findings and recommendation in Mr. Stine's case.  The Director of CORB issued an advisory opinion on April 16, 2009, stating that "available evidence is insufficient to warrant recommending the requested retrospective change in petitioner's [record] to reflect a higher rating."[22]  AR 2380.

The CORB found evidence in the record suggesting that Mr. Stine's disability rating was correct.  First, it noted that Mr. Stine had received a Navy Fitness Report for the period of September 2000 to September 2001—the time period of the MEB examination—that described Mr. Stine's ability "to perform administrative functions" and stated that Mr. Stine assisted "with preparations for the FY01 Equipment Buy."  AR 148, 2385-86.  Additionally, despite his medical conditions, the Fitness Report indicated that evaluations continued to grade Mr. Stine as "promotable."  AR 2386.

Second, the CORB observed that the primary criticism of Mr. Stine's work was not that the mental health symptoms prevented him from adequately completing the work, but rather that he "ha[d] not been present at work for more than 5 hours a week in recent months because of a continuing plethora of medical appointments" and that he was restricted from operating certain

---

[22]    The IPEB had classified Mr. Stine's PTSD as Category III; CORB recommended that the PTSD diagnosis be reclassified as Category II.  AR 2380; SECNAVINST 1850.4D § 4111.  This change would have had no effect on Mr. Stine's rating because neither Category II nor III conditions are assigned VASRD ratings.  SECNAVINST 1850.4D § 4111.  BCNR, however, rejected this recommendation because it found that the record could be administratively corrected by the President of the PEB.  AR 2367.  Plaintiff does not challenge this decision.

equipment because of the various medications he was taking.  AR 2386.

Third, CORB found it significant that Mr. Stine initially demanded an FPEB hearing but then changed his mind and accepted the IPEB findings "despite contention[s] of having received poor advice."  AR 2386.  Specifically, CORB referred to the letter Mr. Stine received from Dr. Smith dated October 1, 2001 suggesting that he should receive a higher disability rating.  AR 2405-06.  CORB stated that "[i]n essence, [Mr. Stine] rescinded his previous (10 August 2001) petition for an FPEB appearance.  Combining this sequence of events with the fact that the memo was unsigned suggests that the memo represented a draft proposal to [Mr. Stine] who may, then, have rejected it."  AR 2387.  CORB therefore found the letter to suggest that Mr. Stine's rating was, in fact, correct.[23]

Fourth, CORB pointed to evidence in the record that, despite Mr. Stine's condition, he had made plans to "return to college" in Ohio and "had every expectation of assuming employment at the Defense Supply Center, Columbus, OH to begin shortly after discharge."  AR 2339, 2386.

Finally, CORB found the psychological testing done by DVA doctors not to be probative of Mr. Stine's pre-discharge condition, finding that "the [DVA] record suggests an early post-separation deterioration in occupationally relevant functioning (including panic anxiety attacks) which prevented petitioner from beginning the previously anticipated employment."  AR 2382.  Additionally, CORB noted that the DVA report specifically stated that Mr. Stine's poor performance in psychological testing was inconsistent with his general mental status and thus "unconsciously or consciously poor performance [was] not ruled out."  AR 1621, 2388.  That is, DVA doctors had not ruled out the possibility that Mr. Stine was deliberately performing poorly on the psychological tests in order to make his condition appear more severe than it actually was.

CORB concluded by agreeing with the PEB's 10% rating, opining that Mr. Stine's "symptoms of mental illness were on the mild end of the disability spectrum while on active duty despite long-standing personal suffering.  Indeed such a clinical posture, and, apparently, positive expectation [to go back to work after he was discharged] would be compatible with petitioner's

_____

[23] CORB's observations lend support to the view that Mr. Stine was legally competent at the time that he waived review of the IPEB determination.  *See infra* Part B.1.  It is unclear, however, how Mr. Stine's apparent ability to make strategic decisions provides evidence as to whether the IPEB's disability rating was correct.  But the timing of the unsigned memorandum does support CORB's view that it was a draft or proposal and therefore should not be considered in determining the appropriate disability percentage.  CORB did not comment on Dr. Smith's apparently contradictory endorsement of the MEB report, which stated that Mr. Stine was competent to manage his own affairs.  AR 70.  This contradiction lends further support to CORB's understanding of Dr. Smith's letter as a draft or proposal to support a potential challenge by Mr. Stine to the IPEB findings before an FPEB.  However, Mr. Stine deliberately did not pursue this course of action.  Rather, he elected to withdraw his appeal to the FPEB and waive such review.

decision to rescind his demand for [an FPEB]."  AR 2386-87.

After CORB issued its advisory opinion, the BCNR requested that CORB confirm that it had considered the submissions of Mr. Stine's counsel.  AR 2380.  CORB reconsidered its opinion and on May 1, 2009, issued a second opinion confirming its previous findings.  *Id.*  Mr. Stine's counsel urged CORB to consider the collective influence of all the medical conditions the IPEB found were not unfitting.  But CORB found that considering these additional medical conditions did not change the result because while "their collective influence may have been unfitting due to 'overall effect' . . . the permitted disability rating under such circumstances is limited to '0%' and, hence, of little practical consideration in the current context."  AR 2383. That is, because none of the other medical conditions were classified as "unfitting" Category I conditions, they would not have been assigned a rating under the VASRD and could not have affected Mr. Stine's total disability rating for unfitting conditions.  SECNAVINST 1850.4D § 4111.  Additionally, CORB rejected Mr. Stine's counsel's contention that 38 C.F.R. § 4.129 required Mr. Stine to have been assigned a rating of over 50% because PTSD itself was not found to be an unfitting condition by either the IPEB or CORB.[24]  AR 2383-84.

### iii.     BCNR Decision and Findings on Remand

After receiving the two advisory opinions, a three-member panel of BCNR sat in executive session and reconsidered Mr. Stine's application.  AR 2366-74.  Ultimately, BCNR upheld its 2004 decision because it "was not persuaded that [Mr. Stine] suffered from any unfitting conditions at the time of [his] discharge other than major depression,[25] or that [he] should have received any disability other than the 10% rating [he] accepted on 4 October 2001." AR 2367.  The Board conducted a detailed review of the record and addressed the arguments advanced by Mr. Stine's counsel.

First, the BCNR addressed the argument that Mr. Stine received erroneous advice from his attorney, Ms. Pintar, thereby rendering the waiver of FPEB review involuntary.  AR 2367-68. The Board rejected this argument, agreeing with Ms. Pintar's "conclusion that a hearing panel of the PEB might have found [Mr. Stine] fit for duty, in which case [he] would have been faced with the possibility of administrative separation."  AR 2367.  Specifically, BCNR noted that Mr. Stine was described as "obese" in March 2001, which "suggests that [he] might have been

---

[24] Section 4.129 requires a VASRD rating of "not less than 50 percent" if the service member is rendered unfit for service because of PTSD.  38 C.F.R. § 4.129 (2009); *see* Final Rule: Schedule for Rating Disabilities; Evaluation of Residuals of Traumatic Brain Injury, 73 Fed. Reg. 54693 (Sept. 23, 2008) ("Section 4.129 ensures that veterans with certain mental disorders, primarily PTSD, receive an immediate post-discharge evaluation of at least 50 percent, when discharged for those mental disorders.").

[25] The Board and CORB advisory opinions both acknowledged that Mr. Stine's major depression *and* anxiety disorder were found to render him unfit for continued naval service.  *See, e.g.,* AR 2, AR 2380.

processed for separation for failing to conform to Navy weight and body composition standards had the PEB found [him] fit for duty." AR 2368. BCNR also concluded that it did not have sufficient information to determine what action, if any, would have best ensured Mr. Stine's ability to affiliate with the Navy Reserves and obtain a military retirement, but ultimately rejected the contention that Ms. Pintar had given faulty advice that caused Mr. Stine to waive his FPEB hearing. *Id.*

The Board then spent significant time discussing what it perceived to be Mr. Stine's "lack of candor and credibility with regard to [his] medical history and state of health." AR 2368. BCNR noted that Mr. Stine's medical reports were based on his "unverified, subjective representations concerning the nature and severity of [his] claimed disabilities, which Navy physicians and [DVA] rating officials apparently accepted as true." *Id.* Specifically, BCNR pointed to the same psychological testing that the CORB advisory opinion referenced, where a DVA doctor had stated that the test results were "inconsistent with the results of [Mr. Stine's] general mental status examination and that . . . 'unconsciously or consciously poor performance' . . . had not been ruled out." AR 1621, 2372. Like the CORB, the Board found this statement to suggest that Mr. Stine could have been deliberately performing poorly on the psychological tests in order to make his condition appear more severe.

BCNR also detailed Mr. Stine's extensive medical record prior to his second period of naval service. AR 2368-69. BCNR noted that, despite this history, on the SF 93 that Mr. Stine filled out before his re-enlistment in the Navy in 1988, he reported a history only of "tumor, growth, cyst, cancer" and "foot trouble," while "specifically den[ying] all other significant medical history." AR 2369. Only on April 17, 2001, when the MEB convened to discuss his case and when "[it] was to [his] advantage at that time to fully disclose [his] medical history" did Mr. Stine "disclose[] a history of thirty-seven conditions, to include several that existed prior to [his] initial enlistment in 1976 or pre-dated [his] re-enlistment in the Navy Reserve in 1988." AR 2370; *see* Def.'s Mot. at 21 ("Upon review of Mr. Stine's service medical records . . . created after his second enlistment, the BCNR determined Mr. Stine sought medical treatment for many of the same maladies he had failed to report during his entrance physicals."). These inconsistencies caused BCNR to "question[] the veracity of [Mr. Stine's] complaints, as well as the validity of the diagnoses of mental disorders referred to the PEB. . . . The author of the medical board report noted that [Mr. Stine's] reported inability to function was out of proportion to [his] physical symptoms . . . . [BCNR] believes that the disparity might be attributable to [Mr. Stine's] desire to maximize [his] disability entitlements." AR 2371-72.

Next, BCNR reviewed the legal arguments submitted by Mr. Stine's counsel, finding that "nothing contained therein demonstrates the existence of material error or injustice in [Mr. Stine's] naval record." AR 2371. BCNR rejected Mr. Stine's argument that CORB and BCNR had "failed to adequately weight the 'factual findings' of [his] medical condition" since the MEB stated that Mr. Stine's PTSD was *severe*. AR 2371. BCNR concluded that "[t]he fact that a disorder is classified as severe by a medical board does not require the PEB to find the disorder unfitting." *Id.* BCNR also rejected Mr. Stine's contention that "[t]he contents of the non-medical assessment provided by [Mr. Stine's] former commanding officer . . . [required] the PEB

to find [some] of the twenty-seven conditions described in the medical board report unfitting and ratable." *Id.* It found that the IPEB's decision was supported by the record despite the belief of Mr. Stine's commanding officer that he was unable to perform his duties, because that assessment was non-medical. *Id.* Lastly, BCNR rejected Mr. Stine's arguments regarding 38 C.F.R. § 4.129 and equitable tolling.[26] AR 2372-73.

Finally, the Board turned to Mr. Stine's argument that he had not received notice of his rights before the MEB and PEB because he was legally incompetent and therefore was not capable of waiving review of the IPEB findings. AR 2372. BCNR observed that "there had been no past finding of mental incompetency or incapacity, and . . . [Mr. Stine was] considered fully competent to be discharged to [his] own custody." *Id.* Additionally, the Board rejected the probative value of the unsigned letter by Dr. Smith, noting that despite her assessment that Mr. Stine's PTSD was severe, he was "not undergoing psychotherapy when the statement was prepared because of the lack of 'trauma therapists,' and that [Mr. Stine] and Dr. Smith agreed that [he] would not undergo therapy while [he] remained in San Diego 'due to the length of time and intensity of involvement required for this type of therapy,' even though Dr. Smith believed [he] required 'intensive, constant psychotherapy.'" AR 2372, 2405-06. In other words, despite some indication that Dr. Smith considered Mr. Stine's conditions to be "severe," she was nonetheless content to allow him to go without treatment during the period that he contended he was legally incompetent. The Board therefore read Dr. Smith's actions to suggest that Mr. Stine was capable of understanding and waiving his rights before the MEB and PEB.

In view of the foregoing, the Board again denied Mr. Stine's application for correction of his naval records.

5.    Post-Remand

After the Board had fully complied with the Court's instructions, on October 20, 2009, defendant filed a renewed motion to dismiss the complaint on jurisdictional grounds along with a motion for judgment on the administrative record. *See* Def.'s Mot. at 25, 33; Rule 52.2(f) of the Rules of the Court of Federal Claims ("RCFC"); *Santiago v. United States*, 71 Fed. Cl. 220, 230 n.17 (2006) ("The results of the proceedings on remand [to the corrections board] are subject to

---

[26] Plaintiff made a somewhat muddled argument before the Board analogizing Mr. Stine's case to the doctrine of equitable tolling previously applied by Court of Appeals for Veterans Affairs. Pursuant to that doctrine, the Court of Appeals for Veterans Affairs permitted the 120-day statute of limitations for filing a notice of appeal to be tolled if the veteran was suffering from a mental illness. *See Barrett v. Principi*, 363 F.3d 1316 (Fed. Cir. 2004), *overruled by Henderson v. Shinseki*, 589 F.3d 1201 (Fed. Cir. 2009) (en banc); *see also infra* note 28 (discussing *Henderson*). Plaintiff appears to have argued before the BCNR that the equitable tolling doctrine can be used as a legal theory upon which to excuse Mr. Stine's waiver of review of the IPEB findings. The BCNR "found nothing in the argument" to be "probative of the existence of error or injustice in [Mr. Stine's] naval record." AR 2372. Plaintiff has not raised the equitable tolling argument before this Court.

this court's review."). Plaintiff opposed defendant's motions but did not cross-move for judgment on the administrative record, instead arguing that "[p]laintiff is entitled to a trial of his case." Pl.'s Resp. at 1.

## II.   Discussion

The Government moves to dismiss or, alternatively, for judgment on the administrative record. For the reasons discussed below, the court will deny the motion to dismiss, but grant the motion for judgment on the administrative record.

### A.   The Court Possesses Jurisdiction Because Plaintiff Waived Review of the Underlying IPEB Determination, Not The BCNR's Decision

Defendant initially sought to dismiss this case, alleging that the court lacked subject matter jurisdiction, but has since withdrawn that contention. *Compare* Def.'s Mot. at 12 *with* Defendant's Reply at 12 n.3 (docket entry 52, Jan. 27, 2010) ("Def.'s Reply"). It was wise to do so. The very cases defendant cites in its motion recognize that whether a service member waived review of his or her disability determination is to be decided on the merits and does not create a jurisdictional defect. *See Van Cleave v. United States,* 402 F.3d 1341, 1344 (Fed. Cir. 2005) (*Van Cleave I*) ("[E]ven if acceptance of a PEB decision may act as a bar to a later claim . . . 'the bar is not jurisdictional in nature.'") (quoting *Maier v. Orr,* 754 F.2d 973, 984 (Fed. Cir. 1985)), *after remand at* 66 Fed. Cl. 133 (2005) (*Van Cleave II*) *and* 70 Fed. Cl. 674 (2006) (*Van Cleave III*); *Gant v. United States*, 63 Fed. Cl. 311, 317 (2004) ("[W]aiver does not give rise to a jurisdictional defect, as plaintiff is challenging the determinations of the PEB."), *aff'd,* 417 F.3d 1328 (Fed. Cir. 2005); *see also United States v. Fisher*, 402 F.3d 1167, 1176 (Fed. Cir. 2005) (en banc); *McHenry v. United States,* 367 F.3d 1370*, *1377 n.6 (Fed. Cir. 2004) ("McHenry's claim may also have been barred because he accepted the decision of the second PEB but, if so, the bar is not jurisdictional in nature.") (citing *Maier,* 754 F.2d at 984).

Here, plaintiff makes non-frivolous allegations of an entitlement to money damages pursuant to 10 U.S.C. § 1201, a money-mandating statute that gives rise to a claim within this court's jurisdiction. *Sawyer v. United States*, 930 F.2d 1577, 1580 (Fed. Cir. 1991); *Banerjee v. United States*, 77 Fed. Cl. 522, 532 (2007). Defendant's motion to dismiss the complaint pursuant to RCFC 12(b)(1) is therefore **DENIED**.

### B.   Defendant is Entitled to Judgment on the Administrative Record

The Court reviews BCNR proceedings with a deferential eye. *Rominger v. United States*, 72 Fed. Cl. 268, 272 (2006); *Van Cleave II*, 66 Fed. Cl. at 136. To prevail upon appeal to this court, plaintiff must show by "cogent and clearly convincing evidence" that "the action of the military is arbitrary, capricious, unsupported by substantial evidence or contrary to applicable statutes or regulations." *Kirwin v. United States*, 23 Cl. Ct. 497, 503 (1991) (quoting *Dzialo v. United States*, 5 Cl. Ct. 554, 561 (1984)). That is, "plaintiff must demonstrate 'that the personnel involved ignored relevant and competent evidence, that they unreasonably construed the

significant body of medical documents before them, or that in [some] other manner they failed to discharge their designated duties.'" *Id.* at 502 (quoting *Stephens v. United States*, 358 F.2d 951, 955 (Ct. Cl. 1966)).  Plaintiff's burden is further increased because he "must also overcome the presumption of regularity which attaches to the actions of the BCNR." *Boyer v. United States*, 81 Fed. Cl. 188, 191 (2008), *aff'd per curiam* No. 2008-5080, 323 F. App'x 917 (Fed. Cir. 2009).

Under RCFC 52.1, which governs all motions for judgment on the administrative record, the court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007) (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006)); *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  RCFC 52.1 is designed "to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356; *see also CHE Consulting*, 78 Fed. Cl. at 387 ("The resolution of cross-motions for judgment under Rule 52.1 is akin to an expedited trial on 'the paper record.'").

This court does not serve as a "super correction board." *Van Cleave III*, 70 Fed. Cl. at 678 (citing *Skinner v. United States*, 594 F.2d 824, 829 (Ct. Cl. 1979)).  That is, the court may not substitute its judgment for that of the BCNR, because "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (citing *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953)).  The BCNR must examine all the relevant facts in the record and explain its conclusions, including "making rational connections between the facts found and the choices made." *Van Cleave III*, 70 Fed. Cl. at 679.  When it fulfills this obligation, but "reasonable minds could reach differing conclusions on the same evidence" the court must uphold the BCNR's decision. *Heisig*, 719 F.2d at 1156; *Kirwin*, 23 Cl. Ct. at 505.

1.    Plaintiff Voluntarily Waived his Right to Seek Review of the IPEB Determination

Ultimately, this Court must determine (1) whether plaintiff in fact waived review of his disability determination, *see, e.g.*, *Metz*, 466 F.3d at 997; *Gant*, 63 Fed. Cl. at 318; and (2) if so, whether that waiver was voluntary, or should be disregarded because it was involuntary. *Gant*, 63 Fed. Cl. at 318.  Plaintiff may demonstrate involuntariness by showing, among other things, that he made the decision under duress, *Gallucci v. United States*, 41 Fed. Cl. 631, 638-39 (1998), that he was mislead by his counsel's advice, *Metz*, 466 F.3d at 998, or that he was legally incompetent at the time of the waiver, *Poole v. United States*, 64 Fed. Cl. 776, 781 (2005).  Finally, if the Court finds that plaintiff voluntarily waived his right to review, the Court must determine the scope of that waiver. *Van Cleave I*, 402 F.3d at 1344; *Van Cleave II*, 66 Fed. Cl. at 135-36.  When the BCNR has already made findings on these questions, the Court must examine whether the BCNR's findings are supported by substantial evidence in the record. *Metz*, 466 F.3d at 998.

With respect to the first issue, there is no question that there is substantial evidence in the record to support the BCNR's finding that Mr. Stine in fact waived FPEB review.  AR 1.  The

record contains a copy of the waiver form signed by Mr. Stine and his counsel, Ms. Pintar, on October 4, 2001.  AR 46.

Nonetheless, if Mr. Stine's waiver was in some way involuntary, the waiver is ineffective. *Gant*, 63 Fed. Cl. at 318; *Poole*, 64 Fed. Cl. at 781.  Mr. Stine argues that he was legally incompetent when he waived his rights to a FPEB hearing.  Pl.'s Resp. at 10-13.  After this Court remanded Mr. Stine's case to the BCNR, the Board rejected this argument, AR 2372, and the Government argues that this finding is supported by substantial evidence.[27]  Def.'s Mot. at 30.

The court generally "presumes competency and sanity, and a party claiming legal disability has a heavy burden of proving legal incapacity."  *Schmidt*, 89 Fed. Cl. at 122-23.  To meet this burden, plaintiff must show that his "mental illness . . . [was] acute and extreme . . . [and] render[ed] the plaintiff 'incapable of caring for his property, of transacting business, of understanding the nature and effect of his acts, and of comprehending his legal rights and liabilities.'"  *Ware*, 57 Fed. Cl. at 788 (quoting *United States v. Goewey*, 612 F.2d 539, 544 (Ct. Cl. 1979)).  Plaintiff's assertion that he was suffering from "severe mental stress and anxiety" is not sufficient to rebut the presumption.  *Gallucci*, 41 Fed. Cl. at 643.  To successfully sustain his burden, plaintiff must show that he "was. . . incapable of exercising free will or understanding his actions."  *Id.* (citing *McEntee v. United States*, 30 Fed. Cl. 178, 184 (1993), *aff'd*, 39 F.3d 1197 (Fed. Cir. 1994)).

Both parties cite *Poole*, 64 Fed. Cl. at 778, a case involving a similar factual situation, as supporting their arguments regarding Mr. Stine's competency at the time of the waiver.[28]  Def.'s

---

[27]  Plaintiff had previously argued that he received misleading legal advice from his appointed attorney, Ms. Pintar, rendering his waiver ineffective.  AR 2.  This claim was the subject of OJAG's advisory opinion.  AR 2375-79.  Plaintiff has not pursued that contention further before this court.

[28] Plaintiff additionally draws the Court's attention to *Bowles v. Russell*, 551 U.S. 205 (2007) and *Henderson v. Shinseki*, 589 F.3d 1201 (Fed. Cir. 2009) (en banc), *aff'g* 22 Vet. App. 217 (2008), which, according to plaintiff, may potentially "conflict with the *Poole* principle." Pl.'s Resp. at 10 n.4.  Plaintiff's concern with respect to these cases is misplaced.

In *Bowles*, the Supreme Court, overruling a line of precedent, held that the statutory time limitation for filing a notice of appeal pursuant to 28 U.S.C. § 2107(a) and Federal Rule of Civil Procedure 4(a)(6) is "mandatory and jurisdictional" and therefore not subject to equitable tolling based on "unique circumstances."  *Bowles*, 551 U.S. at 209, 213-14.  In *Henderson*, the Federal Circuit found that *Bowles* applied to prevent equitable extension of the statutory time period for a veteran to appeal a decision of the Board of Veterans' Appeals to the United States Court of Appeals for Veterans Claims, finding that the statute at issue, 38 U.S.C. § 7266(a), is also jurisdictional and mandatory.  *Henderson*, 589 F.3d at 1213-14.

*Poole* presents an entirely different inquiry.  The principle that a person who is legally

Mot. at 31-32; Pl.'s Resp. at 11.  In *Poole*, an army lieutenant was found to be 30% disabled due to a "delusional disorder, persecutory type, manifested by exaggerated concerns that co-workers have bugged his home, office, and car." *Poole*, 64 Fed. Cl. at 778.  Like Mr. Stine, Mr. Poole accepted the IPEB's findings. *Id.* at 779.  Mr. Poole later applied for relief to the Army Board for the Correction of Military Records, presenting evidence that while in the Army, he was "hospitalized . . . for mental health reasons . . . after he became delusional and claimed that his home phone was tapped.  He was also apparently suffering from hallucinations at the time." *Id.* at 778-79.  The Government argued that Mr. Poole could not challenge the IPEB's findings due to his prior waiver, but the court found that the purported waiver was ineffective because Mr. Poole had presented sufficient evidence to show that he was legally incompetent at that time. *Id.* at 781.

Plaintiff asserts that his condition is an "at least equally incapacitating, if not worse, mental disability as that which was suffered by Mr. Poole." Pl.'s Resp. at 11.  As support, plaintiff points to his DVA records, which state his PTSD and anxiety disorder affected his "ability to function independently." AR 10.  Plaintiff further notes that the DVA assigned him a 70% disability rating for PTSD, anxiety disorder, and depression, 40 percentage points higher than the rating received by Mr. Poole for his psychiatric condition. Pl.'s Resp. at 11.  Mr. Stine also relies upon the unsigned letter from Dr. Smith, the Navy psychiatrist, noting that Mr. Stine "is unable to function in many aspects of his life" and concluding that he has "developed significant symptoms that interfere with all spheres of functioning due to traumas suffered while performing his job on active duty." AR 2405-06 (emphasis omitted).  Finally, plaintiff cites to the MEB finding that while he was legally competent, he might have trouble adapting to civilian work because "he has significant difficulty functioning at work, specifically difficulty with concentration, energy, and motivation." AR 69.

This evidence, taken alone, could suggest that Mr. Stine may have been legally incompetent to waive his rights.  There is, however, conflicting evidence in the record, and here, unlike in *Poole*, the BCNR has specifically addressed the waiver issue and found that Mr. Stine was "fully competent to be discharged to [his] own custody." AR 2372.  The BCNR specifically considered the evidence Mr. Stine relies upon and found it unpersuasive, concluding that Dr. Smith's memorandum "does not establish that [Mr. Stine was] unable to understand and participate in the disability evaluation process, or provide a reasonable basis for further medical board or PEB action in [his] case." *Id.*  Furthermore, the BCNR found "no indication in [his] initial [DVA] rating decision that [he was] mentally incompetent or incapable of managing [his] affairs." *Id.*

The record contains additional evidence suggesting that Mr. Stine was legally competent at the time of the waiver.  First, the MEB that was convened to assess Mr. Stine's condition specifically found that he was "capable of handling his own financial affairs." AR 70.  Second,

---

incompetent may not effectively waive a right is long-recognized in the common law, *see, e.g.,* *Manzi v. United States*, 198 Ct. Cl. 489, 492 (1972), and is wholly distinct from the issue of whether a jurisdictional time-limiting statute may be equitably extended.

the CORB noted that Mr. Stine had received a Navy Fitness Report during the same time period as the MEB examination which praised Mr. Stine's work and rated him as promotable.  AR 148, 2385-86.  Third, Dr. Smith contradicted her own statement when, as a part of the MEB panel, she opined that Mr. Stine was in fact competent.  AR 70.  Fourth, Ms. Pintar's statement strongly suggests that Mr. Stine was aware of his legal rights and "made a calculated decision based upon his desire to maximize his chance at affiliating with a reserve unit and being able to earn enough drill points to qualify for a retirement pension."[29]  AR 2378.  Fifth, even though the DVA reported that Mr. Stine's condition affected his ability to function independently, it also stated that he did not suffer from a "total occupational and social impairment."  AR 10.  Sixth, even during his alleged incompetency, the record includes statements by Mr. Stine that he intended to return to college and to work at the Defense Supply Center in Ohio.  AR 2339, 2386.  Finally, CORB found that the DVA records could be read to suggest that Mr. Stine's condition deteriorated after his departure from the military.  AR 2387.  This post-discharge deterioration would not be probative as to whether Mr. Stine was legally competent at the time he waived his right to FPEB review.  Moreover, despite its assessment as to the severity of Mr. Stine's psychiatric conditions, the DVA specifically stated that Mr. Stine was "competent."  AR 10.

The BCNR considered this conflicting evidence in the record, and concluded that Mr. Stine made calculated and specific decisions to maximize his interests throughout the course of the PEB process.  AR 2370; *see* Def.'s Reply at 5 ("Mr. Stine made a calculated tactical decision to waive his right to a formal PEB hearing and to accept a disability discharge with a 10 percent disability rating.").  Even if the Court disagreed with the BCNR's finding, the Court "is precluded from substituting its judgment for that of a military department in cases in which reasonable minds could reach differing conclusions based upon the same evidence."  *Gallucci*, 41 Fed. Cl. at 643.  The record contains ample evidence of Mr. Stine's competency, and the BCNR's reading of the record is therefore supported by substantial evidence.  Thus, the Court may not disturb the BCNR's finding that Mr. Stine was legally competent to waive his rights to an FPEB hearing.

2.    Plaintiff Did Not Waive His Right to Challenge the BCNR's Refusal to Correct his Military Records Based on the DVA Disability Rating

But this does not end the inquiry.  The Federal Circuit has held that waiver of review of an IPEB determination is not equivalent to waiver of the right to judicial review of "subsequent administrative review of [the] case to determine whether the Navy had committed an error."  *Van Cleave I*, 402 F.3d at 1343.  That is, the form Mr. Stine signed does not waive his right to subsequent review by the BCNR.  Indeed the waiver specifically states only that Mr. Stine "waive[d] [his] right to [a] formal hearing," *i.e.,* a hearing before an FPEB.  AR 46.  Thus, the written waiver does not cover Mr. Stine's right to seek correction of his naval records before the BCNR or this Court's subsequent review of the BCNR's decision.

---

[29]  As defendant indicates, plaintiff has not offered any evidence to dispute Ms. Pintar's statement.  Def.'s Reply at 9.

The Government argues, however, that Mr. Stine has not specifically challenged the BCNR's findings. Def.'s Mot. at 3. While plaintiff's complaint principally challenges the Navy's discharge decision, plaintiff asks for a "finding [that] Plaintiff [was] medically retired at a rating in correlation to the [DVA's] disability findings." Compl. ¶ 29; *see also* Pl.'s Resp. at 1 (stating that plaintiff seeks a judgment that the BCNR's denial of Mr. Stine's application "was arbitrary and capricious"). Thus, the issue of the BCNR's refusal to adopt the DVA disability rating is fairly before the court, because "[e]ven if it can be said that the complaint was inartfully drafted, that does not change the basic thrust of the cause." *Fisher*, 402 F.3d at 1175; *see Melendez Camilo v. United States*, 89 Fed. Cl. 671, 679 (2009). Although plaintiff has waived review of the underlying determination of the PEB, the Court can and will review "the Correction Board's denial of [Mr. Stine's] application for review on the basis of the record before it."[30] *Van Cleave II*, 66 Fed. Cl. at 136 (citing *Pope v. United States*, 16 Cl. Ct. 637, 640 (1989)).

### 3.   The BCNR's Decision Not to Correct Mr. Stine's Records in Light of DVA's Rating was Rational and Supported by Substantial Evidence

Considering only the propriety of the BCNR's decision to deny correction of Mr. Stine's military records (and not the underlying IPEB findings), the principal argument raised by plaintiff is that the BCNR arbitrarily refused to consider and give weight to his DVA disability rating. Pl.'s Resp. at 13-20. Defendant, on the other hand, contends that the BCNR's decision was rational and supported by substantial evidence. Def.'s Mot. at 33-35.

The cause of petitions like Mr. Stine's is the underlying tension between the Navy and DVA regarding the use of the rating system promulgated by DVA—the VASRD—in assessing service members' disabilities. *See* 10 U.S.C. § 1201(b)(3)(B); SECNAVINST 1850.4D § 3801. The Navy and the DVA both use the VASRD, but for different purposes. *Pomory v. United States*, 39 Fed. Cl. 213, 219 (2007). The Navy uses the VASRD to determine whether or not the service member is fit "to perform the duties of office, grade, rank or rating." *Haskins v. United States*, 51 Fed. Cl. 818, 826 (2002); *see also Bosch v. United States*, 27 Fed. Cl. 250, 265 (1992); SECNAVINST 1850.4D § 3301. But the DVA "uses VASRD to determine disability ratings based on an evaluation of the individual's capacity to function and perform tasks in the civilian world." *Haskins*, 51 Fed. Cl. at 826. That is, the Navy uses the VASRD to determine what compensation the service member is due for the interruption of his military career, while the DVA is more holistically examining the individual's ability to engage in civilian employment.

---

[30] In this regard, the Court will not address the substance of plaintiff's argument that the Navy was required to rate Mr. Stine's PTSD at 50% pursuant to 38 C.F.R. § 4.129. This regulation only applies if the IPEB finds PTSD to be separately unfitting. *Id.* ("When a mental disorder that develops in service as a result of a highly stressful event is *severe enough to bring about the veteran's release from active military service*, the rating agency shall assign an evaluation of not less than 50 percent.") (emphasis added); *see also* 10 U.S.C. § 1216a (rendering § 4.129 applicable to the military branches); Amended Complaint, *Sabo v. United States*, No. 08-899 (Fed. Cl. docket entry 25, Sept. 2, 2009). The IPEB did not do so, AR 43, and because Mr. Stine has waived review of the IPEB's determination, the Court will not review that decision.

*Slesinski v. United States*, 34 Fed. Cl. 159, 164 (1995) ("An award of a higher VA rating does not establish error or injustice in the Army rating."). Ordinarily, then, the DVA's ratings are not particularly helpful to the BCNR in assessing whether the PEB made a correct rating. *Pomory*, 39 Fed. Cl. at 219 ("The different purposes of the two evaluations [Service Branch versus DVA] make a comparison for the sake of finding error of little value."). Moreover, the Navy takes a snapshot of the service member's condition at the time of separation from the service, while the DVA evaluates and adjusts disability ratings throughout the individual's lifetime. *Id.* at 219 & n.11. As plaintiff recognizes, therefore, "[a] rating disparity between the two systems is not unusual because of the differing standards that must be applied." Pl.'s Resp. at 14; *see Bosch*, 27 Fed. Cl. at 265. While the BCNR must consider all pertinent evidence, including DVA ratings, it is not bound by them because of these differing goals.

Despite this settled law, plaintiff appears to suggest that the Navy is bound by the DVA's ratings. Pl.'s Resp. at 14. Plaintiff argues, citing to SECNAVINST 1850.4D § 3802,[31] that "evaluating a person's fitness for duty and assigning that person his disability rating are . . . separate and unique processes." Pl.'s Resp. at 14. Thus, plaintiff contends, while the initial determination of whether a service member is fit for service is a process unique to the Navy, after that point, the Navy is bound by the DVA's ratings as to those conditions found to be unfitting. *Id.* But pursuant to the regulation cited by plaintiff, the Navy only assigns disability percentages to those conditions it finds are "unfitting." SECNAVINST 1850.4D § 3802. The majority of Mr. Stine's conditions were found by the Navy not to render plaintiff "unfit" for duty. Therefore those conditions were assigned no percentage weight in his disability rating by the Navy. Thus, to equate the Navy rating, which assigned a 10% disability rating to the two "unfitting" conditions of major depressive disorder and anxiety disorder, with the DVA rating of 70% for "anxiety disorder/major depressive disorder/post traumatic stress disorder," would be erroneous. The Navy did not include PTSD as a Category I "unfitting" condition, nor did it assign disability percentages for Mr. Stine's other ailments.

Even if the ratings assigned by the Navy and the DVA to Mr. Stine's psychological illnesses were for the same conditions (which they are not) the Navy may—and routinely

---

[31] SECNAVINST 1850.4D § 3802 provides:

Essentials of Rating Disabilities

    a. The VASRD primarily is used as a guide for evaluating disabilities resulting from all types of diseases and injuries encountered as a result of, or incident to, military service. Because of differences between Military Department and DVA applications of rating policies for specific cases, differences in ratings may result. Unlike the DVA, the Military Departments must first determine whether a service member is Fit to reasonably perform the duties of the member's office, grade, rank, or rating. Once a service member is determined to be physically Unfit for further military service, VASRD percentage ratings are applied to the Unfitting condition(s). Percentages are based on the severity of the condition(s).

does—find that the DVA's higher rating is not probative due to that agency's distinct rating standard, namely the DVA's focus on the effect of the disability on the veteran's civilian employment. *Newman v. United States*, 185 Ct. Cl. 269, 277 (1968); *Haskins v. United States*, 51 Fed. Cl. 818, 826 (2002); *Pomory*, 39 Fed. Cl. at 219. Nor does it change the scope of this Court's review. The only issue here is whether the BCNR considered all of the evidence before it and rationally found that Mr. Stine had not established "probable error or injustice" requiring amendment of his records. 32 C.F.R. § 723.3(e)(2); *see Slesinski*, 34 Fed. Cl. at 164.

Plaintiff maintains that the BCNR's refusal to give the DVA ratings any probative weight was *per se* arbitrary and capricious. Pl.'s Mem. at 17. Certainly the BCNR may not ignore an applicant's DVA records altogether, *see Jordan v. United States*, 205 Ct. Cl. 65, 80 (1974), but in its job of weighing the evidence, the Board may give less weight to DVA records if this decision is rational and supported by evidence.[32] *Haskins*, 51 Fed. Cl. at 826 (correction board's decision was not arbitrary where it considered DVA records and rejected them); *Pomory*, 39 Fed. Cl. at 219 (same); *see also Newman*, 185 Ct. Cl. at 277 (same).

Here, the BCNR considered Mr. Stine's DVA records but found them to be of limited probative value regarding the existence of error or injustice in his naval records. The BCNR concluded that Mr. Stine had engaged in what it found to be a deliberate and strategic under-reporting of his past medical conditions when he sought reenlistment in the Navy in 1989. AR 2371-72. Ultimately, the BCNR relied heavily upon its conclusion that "Mr. Stine's statements regarding his medical history and conditions to the Navy and DVA health care providers are not credible" and therefore, "the medical diagnoses and disability evaluations which rely upon those statements and diagnoses are not credible." Def.'s Mot. at 35; *see also* Def.'s Reply at 2. Because the DVA disability rating rested upon Mr. Stine's self-reporting, the BCNR concluded that those ratings were entitled to little evidentiary weight.

The BCNR's credibility determinations are afforded the same level of deference as any of its fact-based determinations.[33] *DeCicco v. United States*, 677 F.2d 66, 70 (Ct. Cl. 1982); *Six v.*

---

[32] Likewise, plaintiff's argument that if the BCNR decision is accepted by this Court "veterans will then be prohibited from any form of substantive review of BCNR decisions" because "regardless of the rating assigned by the DVA, no rating would be considered as evidence of the existence of error or injustice in Plaintiff's naval records," Pl.'s Resp. at 16-17, must be rejected. As detailed above, there is a copious (and controlling) body of law holding that as long as the Board considers the DVA records, it is permitted to give those records minimal weight due to the differences in the standards used by the DVA and service branches in applying the VASRD ratings and making disability determinations. *See, e.g., Newman*, 185 Ct. Cl. at 277; *Haskins*, 51 Fed. Cl. at 826.

[33] Some have questioned the level of deference due to credibility findings in the wake of *Van Cleave III*, where Judge Hodges found that "[t]he reasons the BCNR gave for its claim that Mr. Van Cleave was not credible ranged from the petty to the absurd." *Van Cleave III*, 70 Fed. Cl. at 679 n.6; *see also id.* at 682 (characterizing the Board's attacks on Mr. Van Cleave's

*United States*, 79 Fed. Cl. 581, 597 (2007) ("The court agrees with defendant, that given the Board's credibility determinations . . . the BCNR's finding . . . is supported by substantial evidence.") (internal quotation omitted), *motion for reconsideration denied*, 80 Fed. Cl. 694 (2008). The BCNR's determination regarding Mr. Stine's credibility is both rational and supported by substantial evidence. The record discloses a large disparity between the conditions Mr. Stine disclosed on his 1989 SF 93 and the many medical conditions he actually suffered from in the period before his re-enlistment. The failure to disclose, for example, his ganglion cyst surgery cannot be attributed to a mistake or misunderstanding. *Van Cleave III*, 70 Fed. Cl. at 680 (finding BCNR's credibility determination to be irrational when plaintiff's misstatement could be easily attributed to "misunderstanding [and could not] properly be described as a 'false claim.'"). Mr. Stine's non-disclosure of his significant medical history belies any claim of inadvertence. The BCNR listed a plethora of diagnoses appearing in Mr. Stine's medical records during his first service and in the interim period before his re-enlistment that Mr. Stine simply did not report to the Navy on his SF 93. AR 2368-70.

Given this history of misleading disclosures, the Board concluded that it could not trust the DVA rating, which was largely based upon Mr. Stine's own report. This conclusion is supported by sufficient evidence in the record and the Court must accordingly defer. *See Six*, 79 Fed. Cl. at 592 (upholding BCNR's determination where it "perceived plaintiff as a person of uncertain credibility with a habit of stating facts in a self serving manner consistent with his immediate interests" based on, *inter alia*, failure to report medical conditions).

Plaintiff takes issue with the BCNR's finding regarding the extent to which the DVA relied upon his own statements, maintaining that the DVA doctors were aware that Mr. Stine could have been misrepresenting his symptoms and took this possibility into account in reaching his diagnoses. Pl.'s Resp. at 19. That is, plaintiff argues that it was arbitrary and capricious of the BCNR to disregard the diagnoses of DVA doctors "on the basis that Plaintiff somehow 'fooled' the professionals." *Id.* But the BCNR specifically concluded, based upon the record before it, that Mr. Stine's history of selective reporting rendered all his statements about his symptoms unreliable. AR 2370. Because of this lack of credibility, the BCNR found that Mr. Stine's descriptions of his symptoms to DVA doctors were necessarily untrustworthy. AR 2368.

Doctors must, at times, base their diagnoses solely on what the patient tells them, particularly "when, as here, the alleged disability arises from purely psychological, as opposed to

---

character as "gratuitous and irresponsible"). *Van Cleave III* stands for the non-controversial proposition that when the BCNR's fact-based determination is unsupported by substantial evidence, then this court must reverse that determination. *Id.* at 686. *Van Cleave III* does not alter the longstanding rule that the Court must defer to the BCNR's credibility determination if it was supported by substantial evidence and rationally explained. *See Boyer*, 323 F. App'x at 920 ("*Van Cleave* does not stand for the sweeping proposition that a board may not judge an applicant's credibility in the course of weighing evidence."), *aff'g* 81 Fed. Cl. at 199 n.5 (deference must be afforded to BCNR's credibility determination).

physical, disorders." *Vanieken-Ryals v. Office of Personnel Mgmt.*, 508 F.3d 1034, 1042 (Fed. Cir. 2007).  When there is evidence to question the underlying bases on which these types of "subjective" diagnoses are founded, then the Board is entitled to question the validity of the diagnoses themselves.  *See Black v. United States*, 28 Fed. Cl. 177, 184 (1993) (upholding correction board's decision finding that there was "no credible evidence" supporting the DVA's diagnosis), *aff'd per curiam* 16 F.3d 421 (Fed. Cir. 1993) (unpublished table decision).  The Board's decision to question the factual underpinnings of the DVA doctors' diagnoses was therefore rational.  The BCNR's conclusion is supported by substantial evidence, and it is not within the Court's province to second-guess that finding.

Next, plaintiff argues that even if the Board properly discounted the DVA records, there is nonetheless evidence in the record that Mr. Stine should have been given a higher rating for PTSD and the Board should have taken this evidence into account.  Pl.'s Resp. at 18.  Plaintiff points to the MEB's statement that Mr. Stine's PTSD was "severe" and his major depressive disorder was "chronic."  AR 59.  As further evidence of the severity of Mr. Stine's condition, plaintiff cites the statement by Mr. Stine's commanding officer who questioned Mr. Stine's ability to serve in the Navy.  Pl.'s Resp. at 19; AR 106.

The problem with plaintiff's argument is that even if his PTSD were severe, the IPEB did not find it to be an unfitting condition, and that conclusion is not properly challenged here.  The Board noted that "[t]he fact that a disorder is classified as severe by a medical board does not require the PEB to find the disorder unfitting."  AR 2371.  While the MEB makes a medical diagnosis, it is only the PEB that determines fitness for naval service, and it is under this standard that the PEB assigns ratings.  *See* MANMED § 18-11(4) ("The determination that a member is fit (or unfit) for continued naval service (and if unfit, at what percentage of disability rating and which disability benefits apply) is solely and exclusively the responsibility of the PEB.").

Moreover the BCNR also considered the statement by the commanding officer and found it non-probative regarding whether Mr. Stine's medical conditions rendered him unfit for service.  AR 2371 ("The contents of the non-medical assessment provided by [Mr. Stine's] former commanding officer, which was requested by the PEB, did not require the PEB to find any of the twenty-seven conditions described in the medical board report unfitting and ratable.").  The Court concludes that the BCNR acted rationally and with substantial supporting evidence in finding that Mr. Stine failed to present evidence apart from the DVA ratings sufficient to show that his naval records ought to be corrected in order to remedy "probable material error or injustice."  32 C.F.R. § 723.3(e)(2); *see also* 10 U.S.C. § 1552(a)(1)*.*

To the extent plaintiff alleges error by the IPEB, Mr. Stine's waiver precludes the Court from reviewing such allegations.  Notwithstanding the waiver, plaintiff's pointing to contrary evidence in the record is insufficient to overcome the Board's rational and well-supported rejection of Mr. Stine's arguments.  *Heisig*, 719 F.2d at 1155.  This type of weighing of evidence is precisely the kind of determination that the BCNR is equipped to make and to which the Court must defer.  *See Kirwin*, 23 Cl. Ct. at 502 (noting that the standard of review of a correction board's decision "does not require a reweighing of the evidence") (quoting *Heisig*, 719 F.2d at

1157).

## CONCLUSION

Because the BCNR's decision was supported by substantial evidence, defendant's motion for judgment on the administrative record is **GRANTED** and the decision of the BCNR is **AFFIRMED**.  The Clerk is directed to enter judgment in favor of defendant.

The Court entered a protective order in this action on September 17, 2008 (docket entry 18).  This opinion shall therefore be **filed under seal.**  The parties shall review the opinion to determine whether, in their view, any information should be redacted prior to publication in accordance with the terms of the protective order.  The parties shall file, within 10 days of the filing of this opinion, a joint report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for their proposed redactions.

**IT IS SO ORDERED**.

                 s/ George W. Miller
                 GEORGE W. MILLER
                 Judge